# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MINNESOTA

Case No: Case No: _____ *SEALED*

**RECEIVED**
BY MAIL

JUN 2 8 2023

CLERK, U.S. DISTRICT COURT
ST. PAUL, MN

United States of America, ex rel., BYRON ANDERSON,
EUGENE BANKS, ALLYN SCHLUMPBERGER,
EDWARD URBANEK, DENNIS LINEHAN, and
TERRANCE FRIEND

Relators

-V-

**COMPLAINT**

MINNESOTA DEPT. OF HUMAN SERVICES
JODI HARPSTEAD, DHS Commissioner et.
MARSHAL SMITH, DCT Chief Executive Officer,
NANCY JOHNSTON, MSOP executive Director,
and the DHS County Human Service Boards for:

| | |
|---|---|
| The county of Aitkin, | The county of Grant, |
| The county of Anoka, | The county of Hennepin, |
| The county of Becker, | The county of Houston, |
| The county of Beltrami, | The county of Hubbard, |
| The county of Benton, | The county of Isanti, |
| The county of Big Stone, | The county of Itasca, |
| The county of Blue Earth, | The county of Jackson, |
| The county of Brown, | The county of Kanabec, |
| The county of Carlton, | The county of Kandiyohi, |
| The county of Carver, | The county of Kittson, |
| The county of Cass, | The county of Koochiching, |
| The county of Chippewa, | The county of Lac Qui Parle, |
| The county of Chisago, | The county of Lake, |
| The county of Clay, | The county of Lake of the Woods, |
| The county of Clearwater, | The county of Le Sueur, |
| The county of Cook, | The county of Lincoln, |
| The county of Cottonwood, | The county of Lyon, |
| The county of Crow Wing, | The county of McLeod, |
| The county of Dakota, | The county of Mahnomen, |
| The county of Dodge, | The county of Marshall, |
| The county of Douglas, | The county of Martin, |
| The county of Faribault, | The county of Meeker, |
| The county of Fillmore, | The county of Mille Lacs, |
| The county of Freeborn, | The county of Morrison, |
| The county of Goodhue, | The county of Mower, |

**SCANNED**

JUN 2 8 2023

U.S. DISTRICT COURT ST. PAUL

Bx

The county of Murray,
The county of Nicollet,
The county of Nobles,
The county of Norman,
The county of Olmsted,
The county of Otter Tail,
The county of Pennington,
The county of Pine,
The county of Pipestone,
The county of Polk,
The county of Pope,
The county of Ramsey,
The county of Red Lake,
The county of Redwood,
The county of Renville,
The county of Rice,
The county of Rock,
The county of Roseau,
The county of St. Louis,
The county of Scott,
The county of Sherburne,
The county of Sibley,
The county of Stearns,
The county of Steele,

The county of Stevens,
The county of Swift,
The county of Todd,
The county of Traverse,
The county of Wabasha,
The county of Wadena,
The county of Waseca,
The county of Washington,
The county of Watonwan,
The county of Wilkin,
The county of Winona,
The county of Wright,
The county of Yellow Medicine,
The county of White Earth,


In their individual capacities where applicable, and official capacities where applicable,


Respondents.

## INTRODUCTION

1.      Byron Anderson, Eugene Banks, Allyn Schlumpberger, Edward Urbanek, Dennis Linehan, and Terrance Friend (**"Relators"**) bring this *Qui Tam* claim on behalf of the Unites States of America under 31 USCS 3730 (b), and in accordance to Rule 4(d)(4) [Rule 4(i)] of the Federal Rules of Civil Procedure. This Complaint alleges the administration for Minnesota's Department of Human Services ("DHS"), in alliance with each county DHS agency, knowingly and willfully submitted false claims in violation to 18 USCS 1347, 1035, as well as 31 USCS 3729 *et seq.*

## STATEMENT OF THE CASE

2.      Relators are only 6 of the nearly 800 similarly situated persons committed to the care of the Respondents under the identical process. This *Complaint*, along with its supporting declarations outlines the process devised to exploit the States most vulnerable patients, while knowingly defrauding federally funded programs, including; (1) adult mental health programs, (2) General/targeted case management services, (3) Medical assistance, or Medicaid programs.

3.      On behalf of the United States Government, Relator bring the following claims:

a) Failure to carry out a State Plan for medical assistance in violation to 42 USCS 1320a-2 and 42 USCS 301 et seq.

b) Health care programs fraud, and conspire to commit mail fraud in violation of 18 USCS 1341, 1347, and 1349.

c) Making false statements or representations with respect to condition or operation of institutions in violation to 42 USCS 1320a-7b (c).

4.      On behalf of the United States of America, Relators seek to recover any overpayment, incorrect payment, fraudulently retained funds, along with treble damages, cost of suit and attorney fees.

5.      On behalf of themselves, Relators seek award of at least 15 percent, but not more than 25 percent of the proceeds of the action or settlement of the claim under 31 USCS 3730 (d)(1).

## JURISDICTION AND VENUE

6.     This court has jurisdiction over a matter brought by a private person under 31 USCS 3729 *et seq.*

7.     This court has supplement jurisdiction under 18 U.S.C. 1341 *et seq.,* for all civil actions arising under the Constitution, laws, or treaties of the United States, to wit, the Health Insurance Portability and Accountability Act (HIPAA); Medicare and Medicaid Federal Health Care; mail fraud and other allegations.

8.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the acts and omissions giving rise to these claims occurred in the State of Minnesota and the Respondents all reside in the State of Minnesota.

## PARTIES

### I.     Relators

9.     Byron Anderson, Eugene Banks, Allyn Schlumpberger, Edward Urbanek, Dennis Linehan, and Terrance Friend are all civilly committed to the care of Department of Human Services facility located at 1111 Highway 73, Moose Lake MN. 55767. Each Relator is an eligible recipient of publicly funded general assistance, medical assistance, Medicaid, and Adult Mental Health programs at all times relevant to this action. Each Relator has direct knowledge of all alleged fraudulent actions, and swears all facts or statement or exhibits are true and correct to the best of their knowledge.

## II.    Respondents

10.    Respondent Department of Human Services ("DHS") is a body corporate and politic of the State of Minnesota, and is the superior administrative entity governing the MSOP. In this capacity of superior administrative entity governing the MSOP at all relevant times, the DHS permitted and approved the policies and actions contributing to all violations of rights and laws.

11.    Respondent Jodi Harpstead is the Commissioner of the DHS. Respondent Harpstead is also signatory authority empowered to adopt rules governing the States social service programs, and institutions. In her individual and official capacity, implemented, retained and carried out policies that contributed to acts of fraud at all times relevant to this complaint.

12.    Respondent Marshal Smith is the Chief Executive office for the DHS and its Direct Care and Treatment Division ("DCT"). Smith is also the highest authority and "governing body" over programs operating under his supervision (42 C.F.R. 482.12). Smith is delegated signatory authority empowered to adopt rules governing the States social service programs and institutions. In his individual and official capacity, Smith implemented, retained and carried out policies that contributed to acts of fraud at all times relevant to this complaint.

13.    Respondent Nancy Johnston is the Executive Director for the DHS and its Minnesota Sex Offender Program ("MSOP"). Johnston is also the highest authority and delegated signatory authority empowered to adopt rules governing the MSOP. In her

individual and official capacity, Johnston implemented, retained and carried out policies that contributed to acts of fraud at all times relevant to this complaint.

14.     Each of the 89 listed entity or municipality Respondents have established their own County welfare board, and/or has joined neighboring counties to form a joint board. At all relevant times, State actors for the named agencies work in concert to Respondent Harpstead, and/or permitted and approved the policies and actions contributing to the alleged fraud.

15.     In all respects material to this action, all Respondents acted under the color of law and under the color of their authority as officers and employees of the DHS.

16.     In all respects material to this action, all Respondents acted within the scope of their employment with the DHS, but exceeded the legitimate scope of their official capacity.

## STATEMENT OF FACTS

I.    **Historical facts**

17.    Relators are only 6 of the nearly 800 persons committed to the care of the Commissioner for the Department of Human Services ("DHS") under the identical process. Commitment is commenced by a county attorney who establishes jurisdiction and "county of financial responsibility" under Minn. Stat. 256G. This chapter also acts to join the DHS through its local county welfare agency throughout the duration of the commitment[1].

18.    The majority of those persons committed under the States Sexually Dangerous Persons ("SDP") and sexually psychopathic personality ("SPP") laws were originally subject to the application of Minn. Stat. 253B (re-codified at 253D in 2013). These laws carried the burden of proof requiring the court to find by Clear and Convincing evidence the patient suffer a mental illness component prior to ordering placement into the Regional hospital system defined under Minn. Stat. 246.50 Subd. 3

19.    After committing the highest per capita number of patient to Regional hospitals, the administration of the DHS lobbied for new legislation to separate the Minnesota Sex Offender Program ("MSOP") from the Regional Hospital system. From 2007-2013, DHS leaders testified committed sexual offenders were not mentally ill, had different treatment needs than those committed under mental health laws, and it would be too difficult to make significant operational changes to the MSOP while "embedded"

---

[1] Under Minn. Stat. 256G, the county board becomes responsible for determining the patients eligibility to receive State and Federally funded general assistance, medical assistance, Medicaid, and adult mental health benefits throughout the duration of the commitment. **Discussed *infra***

within the larger SOS management structure[2]. Lawmakers found there was a compelling state interest to justify the adoption and retroactive application of Minn. Stat. 253D, Minn. Stat. 246B, and Minn. R. 9515.3100-3110.

20.     These aforementioned laws re-created the MSOP as an independent infrastructure detached from the Regional hospital system and the "medical model". Formerly committed "patients" were reclassified as "clients" no longer suffered a "mental illness", and therefore are no longer entitled to the same services, treatment, or protections guaranteed under the patient bill of rights. Any remaining obstacles standing in the way of separating these clients from goods and services were bypassed with waivers and variances to program licensing, clearing the way for clients to be transferred to facilities mirroring maximum security prison void of most care and services.

## II.     Respondents fraudulent agenda

21.     As mentioned above, all patients committed prior to 2013 were subject to the application of Minn. Stat. 253B and Minn. Stat. 246.50-55 based on the premise they suffer a mental illness, and receive all-inclusive care in a hospital setting. This theory overlaps, and is necessitous to enhancing Federal funding as county agency process the patient's eligibility to receive medical assistance, Medicaid/Medicare, and adult mental health program benefits.

22.     Although separating the MSOP from the Regional hospital system was incontrovertibly less costly, this accomplishment also stood in conflict with the States

---

[2] See February 2013 Office of Legislative Auditors report (State Operated Services program evaluation) publicly available at http://www.auditor.leg.state.mn.us.

access to Federal funding only available to certified hospitals providing intensive rehabilitative services to patients with mental illness, or qualified disability. To remedy this dilemma, Respondents devised an agenda to create the allusion of the MSOP being a hospital for purpose of enhancing health care benefits as outlined below.

### a)      Case management services

23.      Relator's (and those similarly situated) are each assigned an adult mental health case manager though their respective county DHS agency at the time of commitment[3]. Once assigned, Minn. Stat. 245.462 Subd. 19 require the case manager to provide at least all of the treatment services and case management activities that are provided to adults with mental illness described in sections 245.461 to 245.486. Despite these statutory mandates, these case managers **neglect to perform duties outside those attached to Federal funding** as outlined below:

1) Case managers from each respective county agency have entered each patient into a contractual service provider agreement in accordance to Minn. Stat. 245.466 (incorporating Minn. Stat. 245.474). **** These contacts authorized in-patient placement in Regional hospitals, and require the commissioner be named **third-party beneficiary** to all mental health block grants under Minn. Stat. 245.462 Subd. 16 (expended under section 256D.06).

2) Case managers have also enrolled each patients/clients/wards into general case management under Minn. Stat. 245.4711, or **TARGETED CASE MANAGEMENT** under Minn. Stat. 256B.092 (incorporating Minn. R. 9525.0008 Subp. 24). (*See* in general each Relators exhibits).

---

[3] It remains unclear how eligibility is determined when no county agency completes mandated comprehensive diagnostic evaluations prior to assigning these workers.

**** Payment for these case management services **must be billed to the medical assistance** program under sections 256B.02 Subd. 8; Minn. Stat. 256B.0621 Subd. 3.

24.    In 2008, and again in November 2009, DHS administrator Jannine Hebert notified each county agency the MSOP was separated from operating under State Operated Services as a Regional Hospital. (*See* Anderson exhibit 3).

25.    Throughout legal action brought by the Relators, Respondents conceded to knowing no person at the MSOP is currently eligible to receive adult mental health case management, or targeted case management[4]. (*See* also Schlumpberger exhibit 2-3). Despite knowing the MSOP was no longer a Regional hospital, and while knowing these clients are no longer eligible to receive adult mental health services, Respondents collaborate and conspire with county agents to falsify clients diagnosis, and records where necessary to create the allusion the MSOP remains a Regional Hospital[5]. (*See* Anderson exhibit 1-4-5; Schlumpberger exhibit 4; Banks exhibit 2; and Urbanek exhibit 2). These exhibits all prove the county agencies knowingly and fraudulently identify the MSOP as a Regional hospital (code 472) years after separation from the Regional hospital system.

---

[4] Please take judicial notice to: ***** *Byron Anderson V. Douglas county social services* at Case file no: Case File No: 21-CV-22-1002; ***** *Eugene Banks V. Dakota county social services* at Dakota county Case File No: 19HA-CV-22-1980; ***** *Allyn Lee Schlumpberger vs. Aitkin County Social services at* Case File No: 01-CV-22-705.

[5] Banks exhibit 2 proves the Respondents use the exact same contract number for clients detained in the MSOP as that used for patients (Timothy Market) detained at the Anoka Regional hospital. These documents are presented when submitting claims for federally funded adult mental health block grants.

26.    It also bears mention, an Aitkin county clerks of court appeared to intentionally sabotage litigation when failing to file legal papers, and/or filing papers under the wrong case number. (See the case file of, *Allyn Lee Schlumpberger vs. Aitkin County Social services at* Case File No: 01-CV-22-705").

### b) Respondents Harpstead's Fiduciary duties

27.    Respondents Harpstead, Smith and Johnston are charged with overseeing the daily functions of the MSOP, which by their own design functions as a Hospital (Governing body 42 CFR 482.12) (*See* also Urbanek Exhibit 3).

28.    USCS 42 1320a-7e cross references to 42 U.S.C. 11101 *et seq.* establishing these named Respondents as a "fiduciary" delegated to use health care funds for the purpose of providing proper medical and mental health care, treatment and services to the patients committed to the MSOP. Respondents are also defined as the "withholding agent" responsible for deducting or withholding any taxes or under the provisions 26 USCS 1441, 1442, 1443, or 1461.

29.    Respondent Harpstead and Johnston present the MSOP as a health care provider, and maintain a tax payer **I.D. TIN number 41-1241596.** (See Anderson exhibit 5).

### c) Medical assistance and Medicaid programs

30.    Respondents own policy 315-5136 requires indigent patients/clients/wards to apply for medical assistance, or Medicaid program benefits. Program eligibility is

processed in accordance to combined manual rules 13.15.12 and Minn. Stat. 256D.05 Subd. 1 (a) (3) based on the premise the patient/client/ward is mentally ill, and receiving all-inclusive care in a hospital setting governed by 42 CFR 482.12[6]. (*See* Urbanek Exhibit 3).

31.     Respondent application of Minn. Stat. 256B.05 and Minn. Stat. 256B.35 Subd. 1., allows the patient/client/ward to retain a small portion of their benefits, while the Commissioners of DHS retains the majority of benefits intended to be applied to the clients cost of care[7]. Application of these laws in turn implies the MSOP is a certified hospital, therefore mandating the Respondents adherence to 42 USC 1396a (State Plan for Medical assistance).

32.     Respondents refuse to comply with 42 USC 1396a (State plan for medical assistance), but instead devise an elaborate agenda bypass Federal mandates[8]. Respondent Harpstead, Smith and Johnston begin this fraudulent agenda by maintaining the following licensing:

---

[6] 42 CFR 482.12 ties directly to title XVIII of the Social Security Act, and sets forth requirements regarding medical staff, management, patient care, budgeting, contracting, and emergency services for hospitals receiving funds through the Medicare program.

[7] Minn. Stat. 256B.05 reads: "a person who has been placed in, and is residing in, a **licensed or certified facility** for purposes of physical or mental health or rehabilitation, or in an approved chemical dependency domiciliary facility, if the placement is based on illness or incapacity **and is according to a plan developed or approved by the county agency through its director or designated representative**".

[8] **** **Please note:** Lucinda Jesson was acting commissioner for the Department of DHS responsible for drafting and securing numerous waivers and variances which act as a bypass to licensing requirements. (See Banks exhibit 3). Jesson is currently a Minnesota Appellate court judge playing a major role in continuing to protect the DHS agency from the same fraudulent addenda she helped design.

a) Respondents promulgated rule No. 110-1020 (Governance) identifies the MSOP as a Hospital with a governing body 42 C.F.R. 482.12.

b) Respondents pay an annual $20,000.00 licensing fee to maintain a program license presenting the MSOP as a "medical facility" under Minn. Stat. 245A.02.

c) Under direction of Respondent Harpstead, county DHS workers rely on rule 13.15.12 and Minn. Stat. 256D.05. These laws require the patient to be placed in a licensed or certified facility for purposes of physical or **mental health** or rehabilitation. \*\*\***NOTE:** county agents concede to not even knowing what a "plan" is. (See Schlumpberger exhibit 2 at P. 57).

d) Respondent's application of EPM reference 2.5.4 (Appendix E) presents the MSOP as a certified **Institution for Mental disease** ("IMD") defined under CFR 482.1010.

e) Minn. Stat. 246B Subd. 1 reads: "the commissioner of human services shall apply to the commissioner of health to license the secure treatment facilities operated by the Minnesota sex offender program as **supervised living facilities** with applicable program licensing standards".

33.    Respondents do carry a license under Minn. R. 4665. 0100 Subp. 10, claiming the MSOP as a **"supervised living facility"** when financially rewarding or convenient. Nevertheless, this license is most often overshadowed by the Respondent's variances, the most commonly rely upon **"Secure Treatment Facility"** defined under Minn. Stat. 253B.02 Subd. 18a. (not applicable to the MSOP under Minn. Stat. 253D).

**d)    Waivers and variances**

34.    To aid in creating bypasses to the aforementioned licenses, Respondent turned to the Department of Health to secure numerous (permanent) waivers and

variances which act as a bypass to licensing and staffing requirements (*See* Banks exhibit 3).

35.     Variances are governed by Minn. Stat. 14.055 Subd. 2 (4) which clearly reads, "The agency may not grant a variance from a statute or court order". This same chapter at subdivision 4 (3) goes on to read, "Variance from the rule would not prejudice the substantial legal or economic rights of any person or entity". Finally, and most importantly, Minn. Stat. 14.055 Subd. 2 (2) reads, "A variance has prospective effect only".

36.     The States Department of Health (Laura Plummer Zrust) signed off on these variances despite the fact all variances have retroactive effect, and violate statutory authority governing patients' court ordered commitment entered prior to 2014.

**e)     Policies that interfere with access to services.**

37.     For all persons committed prior to 2008, Minn. Stat. 246.51, Subd. 2 mandated the commissioner to adopt uniform rules, pursuant to chapter 14 of the Minnesota Administrative Procedure act ("MAPA"). With enactment of Minn. Stat. 246B, state legislatures removed this wording, granting the commissioner unbridled powers to adopt rules (which carry the full force and effect of law) without adherence to the MAPA. The commissioner next basically passed this signatory rulemaking authority to any DHS administrator with a pen, resulting in MSOP administrators quickly adopting over 350 new rules exclusive to the MSOP.

38.     Most relevant to this action is MSOP No. 315-5185 (Client requested non-MSOP heath care) which restricts clients access to medical assistance or Medicaid benefits by requiring clients to self-pay for all medical, dental, eye care, or any other

services the MSOP fails to provide on-site, or which the MSOP medical practitioner deems elective or non-essential. This cost not only includes all medical costs, but also incorporates all cost for 2 security personal, mileage and travel costs. (See Declaration of Urbanek).

39.     Due to chronic understaffing, several MSOP clients suffer for years without adequate health care made available to any other eligible recipient of medical assistance or Medicaid programs. (*See* in general Declaration of Linehan) (See also Anderson exhibit 5).

40.     Furthermore, MSOP annual budget reflects all medical, dental, cost being included as part of the MSOP daily per diem rate which is also billed back to the county agency and clients. Any bills not paid are subject to policy No. 125-1065 (Medical bad debt) which allow the State to be reimbursed a second time for costs reimbursable through medical assistance, Medicaid/Medicare.

**f)      Medicaid fraud**

41.     Per MSOP policy No. 315-5136, any MSOP client over age 65 are required to apply for Medicaid benefits programs (Minn. Stat. 256B.055, Subd. 7). Relator Linehan, Friend and Urbanek, as well as 112 other similarly situated clients who exceed the age of 65 are currently eligible recipients of Medicaid programs. As eligible recipients of Medicaid, application of these laws required the Relator to assign rights to these benefits to the Commissioner of DHS under 42 USC 407.

42.    Medicaid is a cooperative federal-state program designed to provide medical assistance to individuals whose income and resources are not sufficient to meet the costs of their necessary care and services. Minnesota's Medicaid program requires that any state program care for must comply with federal law. 42 U.S.C.S. 1396-1396t.

43.    For those patient over age 65 42 USC 1396a reads:

> "if the State plan includes medical assistance on behalf of individuals 65 years of age or older who are patients in public institutions for mental diseases, show that the State is making satisfactory progress toward developing and implementing a comprehensive mental health program, including provision for utilization of community mental health centers, nursing facilities, and other alternatives to care in public institutions for mental diseases"

44.    Despite statutory mandates, Respondents make no efforts to comply with any form of less restrictive placement, while detaining over 111 clients in punitive preventative detention warehouses void of care or services needed to meet the needs of this ageing population.

### g)    State Plan for Medical assistance

45.    Title XIX of the Social Security Act, known as the Medicaid Act, is a cooperative federal-state program. Although the program is voluntary, it requires that when a State choses to participate, any acceptance of Federal assistance places a mandate to the State to comply with requirements of federal statutes and regulations. 42 U.S.C.S. 1396a.

46.    Minnesota counties decision to process eligibility for General assistance, medical assistance or Medicaid programs in the manner outlined above creates a direct tie to 42, USC 1396A (State Plan for Medical assistance). Minnesota's Medicaid program

must comply with federal law. Furthermore, services must be provided with reasonable promptness.

47.    42. USC 1396a (A) (c) (IV) reads:

"if such medical assistance includes services in institutions for mental diseases or in an intermediate care facility for the mentally retarded (or both) for any such group, it also must include for all groups covered at least the care and services listed in paragraphs (1) through (5) and (17) of section 1905(a) [42 USCS 1396d(a)(1)(5) and (17)] or the care and services listed in any 7 of the paragraphs numbered (1) through (24) of such section".

48.    In this case, access to services is complicated by discrepancies as to whether the MSOP is a certified Institution for Mental disease defined under CFR 482.1010[9]. While Respondents application of EPM reference 2.5.4 (Appendix E) implies the MSOP is a certified IMD, Kathleen woods maintains the MSOP is not currently certified as an IMD facility, nor has it ever been certified as an IMD facility.

h)    **Staffing ratios**

49.    Respondents own policy identifies the MSOP as a hospital with a governing body 42 CFR 482.12. This Governing body, with its ties to federally funded medical assistance and Medicaid places a burden on the Respondents to provide intensive rehabilitative treatment services under the supervision of qualified clinical staff. Since the MSOP separated from SOS in 2008, Respondents reduced medical and clinical staffing numbers, while at the same time relaxing the need for staff to be certified or qualified.

---

[9] Relator Anderson has contacted Kathleen Wood for the Joint Commission at 1 Renaissance Blvd. Oakland Terrace IL 60181 (phone 630-792-5800). Ms. Woods has verified the **MSOP IS NOT A CERTIFIED INSTITUTION FOR MENTAL DISEASE**, and the Commissioner does not have a State plan amendment option to provide medical assistance for certain individuals who are patients in certain institutions for mental diseases. 42 USCS 1396N (I).

The reduced numbers of under qualified staff are given fictitious titles such as behavioral analyst, clinical program therapist, and skills development specialist. (See Anderson Exhibit 5).

50.    This reduced number of under qualified staff results in frequent deficiencies in care, inadequate or incomplete documentations, and a failure to provide constitutionally adequate treatment or treatment best adapted according to contemporary professional standards to render further supervision unnecessary in violation of clearly established rights under the Fourteenth Amendment to the United States Constitution, the Minnesota Constitution and the Minnesota Civil Commitment and Treatment Act.

## III.    Respondents fraudulent claims

51.    As outlined above, and throughout the Relators Declaration and exhibits, Respondent's submit claims to the patient's General assistance, medical assistance, Medicaid/Medicare, and adult mental health block grants under the false pretense, and premise these patients receive all-inclusive care in a Regional hospital.

52.    Per Respondents policy No. 125-5300 (Client Social Welfare) federal funds received under false pretense are diverted to the client social welfare account to be deposited into the state treasury in accordance to Minn. Stat. 252.50; 256.88; 256.89; 256.90; 256.91; 256.92.

53.    Minn. Stat. 252.50 Subd. 1 reads in relevant part:

> "The commissioner shall establish a system of state-operated, community-based programs for persons with developmental disabilities. For purposes of this section, state-operated, community-based program means a program administered

by the state to provide treatment and habilitation in non-institutional community settings to persons with developmental disabilities".

54.    After funds are deposited into the State treasury, Respondents return to the application of Minn. Stat. 246B, and the claim the MSOP is not a State Operated Program, and the clients of the MSOP are not mentally ill or disabled. Relators benefits are fraudulently converted, misappropriated, embezzled, and are even unlawfully transferred to pay for Department of Correction's programs.

55.    No person in the MSOP is afforded community placement as required by the implication of these laws, and often remain detained in unnecessary preventative detention warehouses for decades without services. In absence of proper care or services this population is at increased risk of mental, physical and social deterioration, and increased risk of death from lack of medical care.

56.    Additional and relevant financial data may be located the **Social Service Information System ("SSIS")**, the Rates Management System ("RMS"), and Lead Agency Reviews ("LAR").

## IV.   Other related fraud

### i)    COVID - 19

57.    As patients detained in a maximum security facility, MSOP policy prohibits the Relators ability to access on-line sites, and/or prohibit clients from accessing data. To the best of their knowledge, realtors also believe these Respondents have also fraudulently presented the MSOP as a qualified hospital when receiving COVID-19 grants under 42 USCS 1320b-26 (**TIN number 41-1241596).**

58.     Even though the MSOP is not a qualified facility defined under 42 USCS 1320b-26, Relators have reason to believe the MSOP relied on large sums of COVID-19 emergency funding to unfairly enrich MSOP staff. The MSOP administration obviously gained access to large amounts of funding (not reflected in the annual budget), and appeared to intentionally mismanage scheduling to create an overabundance of staffing on their overlapping "heavy days" of Tuesday and Wednesday. The remainder of the week they claimed to be "short staffed" while offering $200.00/per shift bonuses, in addition to 1 ½ -2 times regular pay, plus additional vacation time, and free meals to any staffs wanting extra pay.

59.     During this "cash grab", several staffs worked multiple overtime shifts each week. These staff could often be seen sleeping on the job, or becoming angry and aggressive towards clients, and/or neglecting to provide any care or services which inconvenienced them, or interfered with their time enjoying free high speed internet access. Medical care became almost non-existent, and dietary functions were in disarray. When clients complained about lack of services, staff often responded with snide comments implying COVID – 19 gave them a "blank check" to do what they wanted.

60.     Not surprising, staffing numbers seemed to correct themselves, and excessive overtime opportunities ended the same time Federal COVID – 19 funds were discontinued.

### j) Vocational programing

61.    Respondents receive Federal funding through 7 USCS 2011 *et seq.* to provide vocational programing to clients in the MSOP. (See also Minn. Stat. 246B.06 Subd. 5 which reads:

> "Grants received by the commissioner of human services from the federal government for any vocational training program or for administration by the commissioner of human services must (1) be credited to a federal grant fund and then (2) be transferred from the federal grant fund to the credit of the commissioner of human services in the appropriate account upon certification by the commissioner of human services that the amounts requested to be transferred have been earned or are required for the purposes of this section. Funds received by the federal grant fund need not be budgeted as such, provided transfers from the fund are budgeted for allotment purposes in the appropriate appropriation".

62.    Prior to being provided vocational programing opportunities, each client must be determined to be "vocational ready". This term basically means the client has agreed to sign a W-9 tax form (MSOP TIN 41-1241569) implying each client is self-employed.

63.    After receiving these funds intended to be applied to vocational programing, Respondents turn to their aforementioned waivers, variances or statutes that act as a bypass to the "medical model". Respondent then disguise janitorial duties, dishwashing, snow shoveling, and kitchen duties as "vocational rehabilitation".

64.    To avoid paying clients a minimum wage, Respondents turn to Minn. Stat. 246B. 06 allowing them to withhold 50% client's wages to defer program costs. In addition, the remaining 50% of wages paid to clients is billed back in the daily per Diem in the amount of $1,700,000.00 annually. This amount is then re-billed to counties and/or the Federal government as a "medical bad debt".

## COUNT I

### Failure to carry out a State Plan for medical assistance
### in violation to 42 USCS 1320a-2

65.     Relators adopt and reassert paragraphs 1-61, *Supra*, as well as their attached Declarations and exhibits as if stated *verbatim* herein.

66.     42 USCS 1320a-2 is a provision that sets forth funding condition imposed on the State as a component of the State plan.

67.     42 U.S.C.S. 1396a outlines a State plan for medical assistance, providing that is shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.

68.     Minn. Stat. 256D.05 Subd. 1 (a) (3) imposes additional statutory duties on a County agency to devise a care plan in accordance to regulating authority (42 USCS 1396a).

69.     Based on the policy and procedures created and implemented by Respondents, the MSOP's governing body 42 C.F.R. 482.12 is 42 USCS 1396a's implementing regulation.

70.     Respondents representing each county agency were each aware they assumed a statutorily imposed duty to devise a care plan in accordance to Minn. Stat. 256D.05 Subd. 1 (a) (3), yet did nothing to complete this duty, or to prevent harm from occurring.

71.     Respondents Harpstead, Smith, and Johnston in their official capacity, and individual capacity were each aware of the policies and practices that were implemented

at MSOP deviated from mandatory Federal guidelines. Respondents did nothing to changes these policies and practices, or to prevent this conduct from occurring.

72.     The United States of America, Relators, and those similarly situated have been subject to and injured by these alleged violations as a direct and proximate result of Respondents acts and omissions as specifically set forth above.

73.     Unless relief is granted, the United States of America, Relators, and those similarly situated will continue to be injured and defrauded by as a direct and proximate result of respondent's acts and omissions specifically set forth above.


### COUNT II

**Health care programs fraud, and conspire to commit mail fraud
in violation of 18 USCS 1341, 1347, and 1349.**

74.     Relators adopt and reassert paragraphs 1-61, *Supra*, as well as their attached Declarations and exhibits as if stated *verbatim* herein.

75.     18 USCS 1341 defines "fraud and Swindle' as "whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.....".

76.     18 USCS 1345 provides authority for a court to enter injunctive relief and restraining order if a person or agency is committing, or about to commit a Federal Health care offense.

77.     18 USCS 1347 provides remedy for anyone who knowingly and willfully executes, or attempts to execute, a scheme or artifice, **(1)** to defraud any health care

benefit program; or **(2)** to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services…..".

78.   Under 18 USCS 1349 Respondents who attempts or conspires to commit any offense under this chapter [18 USCS 1341 et seq.] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

79.   Based on the policy and procedures created and implemented by Respondents Harpstead, Smith and Johnston have conspired or collaborated with county DHS agents to design false agenda. Respondents admit to knowingly and willfully admit enrolling patient into adult mental health programs they are not eligible to receive.

80.   The acts and omissions of Respondents, specifically set forth above, constitute felony level health care fraud defined under 18 USCS 1347.

81.   Respondents Harpstead, Smith, and Johnston, in concert with each named county/municipal agency in their official capacity, while acting in their individual capacity where applicable, and individual capacity where applicable  submit fraudulent health care claims based on the false premise these patients are receiving care in accordance to a State plan. Respondents knowing and willful acceptance of funds under false pretense constitutes felony level health care fraud perpetrated against the United States of America in violation of 18 USCS 1341, 1347, and 1349.

82.     The United States of America has been subject to acts of fraud by these alleged violations as a direct and proximate result of Respondents acts and omissions as specifically set forth above.

83.     Unless relief is granted, the United States of America will continue to be defrauded by as a direct and proximate result of respondent's acts and omissions specifically set forth above.

## COUNT III

**Making false statements or representations with respect to condition or operation of institutions in violation to 42 USCS 1320a-7b (c).**

84.     Relators adopt and reassert paragraphs 1-61, *Supra*, as well as their attached Declarations and exhibits as if stated *verbatim* herein.

85.     42 U.S.C.S. 1320a-7b (a) provides criminal penalties for anyone who knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program.

86.     42 U.S.C.S. 1320a-7b(c) provides criminal penalties for anyone who knowingly and willfully makes or causes to be made, or induces or seeks to induce the making of, any false statement or representation of a material fact with respect to the conditions or operation of any institution, facility, or entity in order that such institution, facility, or entity may qualify as a hospital, critical access hospital, skilled nursing facility, nursing facility, intermediate care facility for the mentally retarded.

87.   The acts and omissions of Respondents, specifically set forth above, demonstrate how  Harpstead, Smith, and Johnston falsely represent the MSOP as a hospital (42, CFR 482.12), a Regional hospital (Minn. Stat. 245A.02), a supervised living facility (Minn. R. 4665), an Institution for mental disease (IMD), or a secure treatment facility (Minn. Stat. 246B). Respondents rely on these false certifications and false representations of material fact to enhance incoming federal funding in violation to 42 USCS 1320a-3a.

88.   The acts and omissions of Respondents, specifically set forth above, constitute felony level fraud in violation to 42 USCS 1320a-3a.

89.   The United States of America, Relators, and those similarly situated have been subject to and injured by these alleged violations as a direct and proximate result of Respondents acts and omissions as specifically set forth above.

90.   Unless relief is granted, the United States of America, Relators, and those similarly situated will continue to be injured and defrauded by as a direct and proximate result of respondent's acts and omissions specifically set forth above.

**WHEREFORE**, Relators respectfully requests that this Honorable Court:

1.  **HOLD** a trial by jury on all issues so triable;

2.  **CONVENE** a grand jury to indict any parties subject to criminal sanctions

3.  **GRANT** immediate declaratory and injunctive relief

4.  **DECLARE** that Respondents' policy, practices and actions constitute felony level fraud

5.  **AWARD** the United States of America full restitution and repayment of all health care funds and mental health block grants received under fraudulent or false pretense

6.  **GRANT** such other and further relief as this Court may deem just and appropriate.

I/we declare under penalty of perjury that the foregoing is true and correct in accordance to 28 U.S.C. 1746; 18 U.S.C. 1621.

Respectfully submitted on this 27th day of June 2023

Eugene Banks

Byron Anderson

Allyn Schlumpberger

Edward Urbanek

Terrance Friend

Dennis Linehan